UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MARY DIGENNARO, Individually and as
Limited Executrix of the Estate of Albert
DiGennaro, on behalf of all distributees,

                          Plaintiff,

      -v-

TOWN OF GATES POLICE DEPARTMENT,
POLICE CHIEF DAVID R. DICARO, LT.
JAMES VANBREDERODE, OFFICER
CARL BONFERRARO, OFFICER DANIEL
LOOMIS, TOWN OF GATES, and JOHN DOE,[1]
being other unknown Gates Police Department
Personnel, individually and in their official capacity,

                         Defendants.

_____

DECISION AND ORDER

07-CV-6426 CJS

APPEARANCES

For Plaintiff:             Jeffrey Wicks, Esq.
                      Jeffrey Wicks, PLLC
                      36 West Main Street, Suite 318
                      Rochester, New York 14614

For Defendants:         Michael B. Risman, Esq.
                      Hodgson Russ LLP
                      The Guaranty Building
                      140 Pearl Street, Suite 100
                      Buffalo, New York 14202

_____

[1]Plaintiff has never identified any John Doe defendant, and discovery is now closed and the time for amending pleadings is passed.

INTRODUCTION

This is an action in which Mary DiGennaro ("Plaintiff" or "Mrs. DiGennaro") alleges that Defendants violated the constitutional rights of herself and her husband, Albert DiGennaro ("Albert"), and committed state-law torts, during the course of a police arrest in which Albert died.  Now before the Court is Defendant's motion for summary judgment. (Docket No. [#77]).  The application is granted.

BACKGROUND

Unless otherwise noted, the following are the facts of this case viewed in the light most-favorable to Plaintiff.  At all relevant times, Lieutenant James VanBrederode ("VanBrederode"), Officer Carl Bonferraro ("Bonferraro") and Officer Daniel Loomis ("Loomis") were all employed as police officers by the Town of Gates Police Department in Gates, New York.  At all relevant times, R.D. was an adult, mentally ill man who lived with his elderly parents, Albert DiGennaro and Mary DiGennaro, at their home in Gates. According to Mrs. DiGennaro, R.D. was "bipolar" and "schizophrenic," and since 2006 had thought that "everyone was out to get him." Mary DiGennaro Dep. [#77-3] at 26-27.

The DiGennaro home was well-known to the Gates Police Department because of R.D.'s bizarre and threatening behavior, which was often directed at the DiGennaro's neighbors.[2] *See, e.g.*, Mary DiGennaro Dep. [#77-3] at 150-151.  As examples of this, R.D. had damaged neighbors' vehicles and property, detonated home-made bombs and, on at least one occasion, sat on the hood of a car in his parents' driveway while cleaning a rifle. Diane Hayes Dep. [#77-4] at 92.  R.D.'s behavior resulted in several of the neighbors

---

[2]Because of his mental illness, R.D. believed that one of his female neighbors had killed his son. Mary DiGennaro Dep. [#77-3] at 27-28.

installing video surveillance cameras on their homes. *Id*. at 22-25.  Neighbors also called officers from the Gates Police Department to the DiGennaro residence on several occasions because of R.D.'s behavior.  On one such occasion, police responded after R.D. had been "carrying a rifle around," because he thought that "the mob was after him." Mary DiGennaro Dep. [#77-3] at 62.

On another occasion, in June 2006, Mrs. DiGennaro herself called the Gates Police after R.D. escaped from a mental hospital and returned home.  In response to Mrs. DiGennaro's call, VanBrederode and Bonferraro, as well as other officers, went to the home to arrest R.D., and found him in the bathtub holding a pit bull dog. VanBrederode Aff. [#78-3] at ¶ 14.  On that occasion, Albert attempted to prevent the officers from taking R.D. into custody. *Id*. at ¶ 16.  During that incident, officers confiscated two hunting rifles and a BB gun.  However, a few months later the officers returned the guns to the DiGennaro residence after Albert falsely indicated that the guns belonged to him and not R.D.[3] Mary DiGennaro Dep. [#77-3] at 62-63.

From these contacts with the DiGennaro family, the Gates Police were aware that both R.D. and Albert were combative toward, and uncooperative with, the police. According to Mrs. DiGennaro, Albert, in particular, was  "real excitable" and did not like police officers, because he thought that they were just "looking for trouble." Mary DiGennaro Dep. [#77-3] at 55-56.  Because of Albert's and R.D.'s attitude toward the police, Mrs. DiGennaro worried about police visits to her house, and would retreat to her bedroom when they occurred, because she felt that the police visits, and her husband's

---

[3]One of the rifles was hunting rifle belonging to R.D. that he kept in the entertainment center in the living room. Mary DiGennaro Dep. [#77-3] at 56.

reactions to them, were "scary." *Id.* at 98-99.  Gates Police were also aware, from their prior contacts with the DiGennaros, that Albert and R.D. had access to the aforementioned rifles.  In particular, VanBrederode was aware that Albert "routinely kept a rifle behind the front door." VanBrederode Aff. [#78-3] at ¶ 18.

According to Mrs. DiGennaro, between July 2006 and November 2006, R.D. was "way out of it," "hallucinatory" and "talking crazy." Mary DiGennaro Dep. [#77-3] at 31.  On or about October 28, 2006, R.D. intentionally damaged a video camera on a neighbor's property, which resulted in the Gates Police Department obtaining a warrant for his arrest.[4] On or about October 28, 2006, a Gates Police Officer went to the DiGennaro residence to execute the warrant, but R.D. was not home, because he had left to stay at another family property for a few days. *Id.* at 103.  On the morning of November 1, 2006, R.D. returned to the home, and a neighbor called the police to notify them that R.D. had returned.  Later that morning, VanBrederode, Loomis and Bonferraro  went to the DiGennaro home to arrest R.D., pursuant to the aforementioned warrant.  Parts of the ensuing encounter were observed by at least two neighbors, and were also recorded by a video camera mounted on a house across the street from the DiGenarro residence.

On the day in question, Albert DiGennaro, a retired construction worker, was eighty years of age, and used a cane because of arthritis in his knees.  Albert generally distrusted doctors, and did not have a regular physician. Mary DiGennaro Dep. [#77-3] at 33-34.  In 1982, Albert suffered a heart attack, and was prescribed medication, but he eventually decided on his own to stop taking the medication. *Id.* at 36-37.  Subsequently, Albert did

---

[4]R.D. was subsequently convicted of Criminal Mischief in the Fourth Degree for damaging the neighbor's video camera. Whitehair Aff. [#79-3] at ¶ 37.

not seek treatment from a cardiologist. *Id*. at 37.  During the period between 2000 and 2006, Albert sought medical attention possibly twice – once to have fluid removed from his knee and once, on October 3, 2006, because of chest pains. *Id*.  While seeking medical attention for chest pain in October 2006, at Park Ridge Hospital, Albert declined treatment because he did not want to stay overnight at the hospital. *Id*. at 33, 43.  Albert generally took aspirin when he had chest pains, and early on the morning of November 1, 2006, he told Mrs. DiGennaro that he did not feel well, and took aspirin.  However, Mrs. DiGennaro is not sure whether he did so because of his arthritis or because of chest pain. *Id*. at 52. Later that morning, Albert told Mrs. DiGennaro that he felt well enough to attend their senior citizen's center.

In any event, on the morning of November 1, 2006, at approximately 10:27 a.m., Officers VanBrederode, Loomis and Bonferraro arrived at the DiGennaro residence to execute the warrant.  After Bonferraro surveilled the back of the house and confirmed that R.D. was inside, Van Brederode and Loomis went to the front door and knocked.  R.D. told Albert not to let the officers in the house, and Mrs. DiGennaro retreated to her room because she did not want to witness the impending confrontation.  After Albert opened the door a crack, VanBrederode and Loomis told Albert that they had a warrant, but Albert swore at them and closed the door. Mary DiGennaro Dep. [#77-3] at 128.  During the events that immediately followed, Mrs. DiGennaro remained in her room, and R.D. remained in his room, where he was attempting to telephone his lawyer.  Consequently, it does not appear that either Mrs. DiGennaro or R.D. witnessed the confrontation at the front door.

5

Moreover, video footage taken from across the street is grainy, and does not clearly show what happened inside the doorway.  However, the video footage does clearly show VanBrederode kicking open the door, and then appearing to struggle with Albert in the doorway for many seconds.  According to VanBrederode, after Albert refused to open the door, VanBrederode succeeded in kicking the door open some distance, though Albert, who was 5' 5" tall and weighed 192 pounds, continued to block the doorway with his body and to press against the door to prevent it from opening fully.  VanBrederode attempted to move Albert out of the way, but Albert continued to block the doorway.  VanBrederode then sprayed Albert twice in the face with pepper spray.  Albert, though, seemed unfazed and continued to block the door.  Van Brederode and Loomis then pulled Albert out the door, and down the steps of the house to the front yard.

The above mentioned videotape of the incident, which the Court has reviewed numerous times, while grainy, appears to show that as Van Brederode and Loomis pulled Albert down the small porch stoop, consisting of perhaps three steps, Albert's momentum carried him down to the lawn.  It does not appear to the Court that the officers "threw" Albert on the ground.  Plaintiff, though, contends that the videotape shows Albert being thrown to the lawn with such force that he "bounced." Pl. Memo of Law [#90-4] at 7-8.  Moreover, Stacy Head ("Head"), a neighbor who claims to have witnessed the event from across the street indicates that the officers "threw" Albert on the ground with "a lot of force." Stacy Head Dep. at 11.[5]

_____

[5]On the other hand, when Head was interviewed shortly after the incident, on November 8, 2006, she reportedly told a police investigator that when she looked out the window for the first time during the incident, Albert was already on the lawn:

(continued...)

Once Albert was on the lawn, Loomis handcuffed him, though Albert resisted being handcuffed. While this was happening, Albert repeatedly yelled at the officers, calling them "heartless," and demanding that they give him his cane. The officers placed Albert in a sitting or kneeling position on the lawn, and VanBrederode went inside the house to arrest R.D.. According to Loomis, Albert did not appear to be injured or in any distress at that time. Loomis Aff. [#79] at ¶ 37. VanBrederode brought R.D. outside, placed him on the ground and handcuffed him. Bonferraro then began walking R.D. to a patrol car, when Albert slumped over. Upon seeing his father slump over, R.D. began yelling, "He's having a heart attack, call an ambulance." See, Report [#78-6] at 3. According to VanBrederode, he turned Albert from his side onto his back and removed the handcuffs,[6] and upon seeing that Albert had stopped breathing, performed "about 5 or 6 [chest] compressions," whereupon Albert began breathing again. *Id*. at 4.

VanBrederode then called for an ambulance on his police radio, and shortly thereafter radioed again to expedite the ambulance. VanBrederode indicates that he and another officer, Sergeant Jonathan Ballard ("Ballard"), who had arrived in response to VanBrederode's call for additional help, began performing CPR together, and that while

---

[5](...continued)
When the incident occurred, she said she looked out the upstairs open window, after she heard yelling. The first thing she saw was Albert DiGennaro sitting on the ground. She heard the word 'fuck' being used and felt an officer was using profanity, but was unsure which officer it was. Mrs. Head felt the officers should not have 'pushed the old man down, he is brittle and should never have been placed on the ground.' Although she made this statement, she indicated that the first time she saw Albert he was sitting on the ground, she never actually saw the police 'push' or force Mr. DiGennaro to the ground.

*See*, [#79-4] at 32-33. Head, though, disputes the accuracy of that report. Head Dep. [#90-1] at 6.

[6]The Amended Complaint [#52] at ¶ 30 alleges that Van Brederode "moved [Albert] from his left side onto his back and told [Albert,] "Keep breathing, you're okay. Its going to be okay."

7

Albert initially began breathing again, he eventually stopped breathing and did not respond to further CPR.[7]   Within a few minutes, fire department personnel arrived and began making efforts to revive Albert.

The Court observes, from the time-stamped videotape footage (Affidavit of Scott D. Badaszewski, Ex. A, Docket No. [#93]), that the entire incident, from the time that VanBrederode knocked on Albert's door until the time that the Fire Truck arrived, lasted approximately twelve minutes and twenty-four seconds.  The chronology is as follows: At 10:27 a.m.,[8] VanBrederode knocked on the door; at 10:27:48, VanBrederode began kicking the door; at 10:28:02, VanBrederode began struggling with Albert at the door; at 10:28:30, VanBrederode and Loomis brought Albert down the steps and to the lawn; at 10:29:10 VanBrederode entered the house, while Loomis remained outside with Albert; at 10:30:00, VanBrederode brought R.D. out of the house; at 10:31:01 Albert slumped to the ground; at 10:31:08, R.D. lunged at the officers, after which Loomis and/or Bonferraro took R.D. out of view of the camera; at 10:31:21, VanBrederode appears to bend over and assess Albert; at 10:31:52, VanBrederode knelt beside Albert and appears to begin administering chest compressions; at 10:32:20, VanBrederode stood up, then leaned over Albert; at 10:32:50 VanBrederode knelt down again and appears to be administering aid; at 10:34:22 a police or fire department  sedan arrived; at 10:34:29 another police or fire department  sedan arrived; at 10:34:52, Sergeant Ballard,  reached the spot where

---

[7]The Amended Complaint [#52] at ¶ 31 alleges that Van Brederode "summoned Sgt. Ballard to the scene to administer CPR."

[8]The video tape indicates that the time was 11:27 a.m., however, the owner of the video camera that recorded the footage, David Ercolani, indicates that the time was one hour too fast, because he had not set the clock back to account for daylight savings time. See, Ercolani Dep. [#91-1] at 51.

VanBrederode was assisting Albert, and they together performed CPR; at 10:39:08 a Fire Engine arrived; at 10:39:24 fire fighters arrived at the spot where VanBrederode and Ballard  were assisting Albert.

Significantly, the period between when Albert slumped and the Fire Engine arrived was approximately eight minutes.  For most of that time, except for a period of less than one minute during which the officers were subduing R.D. and VanBrederode was apparently calling for an ambulance, VanBrederode was attending to Albert. *See, id.*[9] Moreover, according to fire department personnel, Albert was still alive when they arrived and began administering aid. *See*, [#79-4] at 33 ("Chief Harrington showed me a printout graph from his department's AED machine (Ventricular Fibulation machine/recorder).  In the first reading, the data showed Albert DiGennaro's heartbeat was 'fluttering.'  At about 10:39 AM, Zampatori gave Albert a 'shock' from the AED unit.  At about 10:40 AM, the graph showed the heartbeat as being within the normal range.").

Defendants have submitted a "medical timeline," taken from fire department records, to which Plaintiff has not objected, which shows the following chronology: 10:30 a.m., VanBrederode requested an ambulance; 10:31, VanBrederode called again to have ambulance expedited; 10:32, fire department was dispatched; 10:37, fire department arrived at the scene; 10:38, fire department reported a heart emergency; 10:39, ambulance arrived.

---

[9]Though her testimony on this point, and on several others, is clearly refuted by the videotape, Stacy Head insists that the officers did not attempt to administer CPR until five or ten minutes after Albert went into distress. Head Dep. at 66, Docket No. [#90-1] at 15 ("I would say a long five, ten minutes maybe, that's when they started to administer CPR.").  Head agrees, though,  that the videotape recording accurately depicts the incident. See, Head Aff. [#90-1] at ¶ 5.

Nevertheless, R.D. contends, in conclusory fashion, that after his father collapsed, the officers "did nothing to assist him." R.D. Aff. [#90-1] at 37.   That characterization, though, is contradicted both by the videotape and by R.D.'s further statements that he "observed a police officer who appeared to be bounding up and down on [his] father's torso and yanking him back and forth," and that he "observed the police officer straddling [his] father at the level of his torso." *Id*.   He further states that, "at one point [he] did observe someone bring what appeared to be a breathing bag to [his] father." *Id*. at 38.   Nevertheless, R.D. insists that he has received CPR training, and that "[a]t no time . . . did [he] observe anyone perform CPR on [his] father." *Id*. at 37.   Importantly, though, R.D. does not indicate how long he was at the scene.   On the other hand, the affidavit of Officer Bonferraro, which is undisputed, indicates that he drove R.D. away from the scene after placing him in the police car, and on the way to the police station they passed the fire trucks and ambulance responding to VanBrederode's emergency call. *See*, Bonferraro Aff. [#78-7] at ¶ ¶ 20-22.

Neighbor Stacy Head, who watched the incident from her bedroom window across the street, also contends that VanBrederode appeared to be slow in providing any kind of treatment to Albert.   For example, at deposition Head stated:

> I know at some point someone did CPR on him, but it felt like a very long time . . . .   [Y]ou could tell everyone got really nervous and didn't know what to do at first.   There was a few minutes of I don't know what to do, just standing around him.   And then I think at one point they realized now they have to do something.   But I didn't see CPR happen for a while after he was down. . . .   [It also took a very long time for the ambulance to arrive].   I mean, I don't know how long it was.   I don't want to say that I know if I don't, but it was at least – I know it was more than 10 minutes, maybe even more than 15.

Head Dep. [#90-1] at 14-15.   However, Head's estimation of time is clearly refuted by the videotape, which as mentioned earlier, shows that the *entire incident*, from the time that VanBrederode knocked on the door until the time that the Fire Truck arrived, lasted twelve minutes and twenty-four seconds.   The videotape also shows that it was a matter of seconds, not minutes, between the time that Albert collapsed and VanBrederode began attending to him.   Furthermore, Head agrees that VanBrederode and others performed CPR on Albert for "five, ten minutes before the ambulance got there." *Id.*, [#90-1] at 15, Dep. p. 68.

As mentioned earlier, Mrs. DiGennaro found confrontations between her husband, son and the police to be very upsetting.   Consequently, while the events were taking place on the DiGennaro's lawn, Mrs. DiGennaro remained in her bedroom, where she attempted to remain calm by reading poetry. Mary DiGennaro Dep. [#77-3] at 129-131.   Mrs. DiGennaro could not see what was happening at the door or outside the house, although she could hear indistinct yelling. *Id.*   Eventually, Mrs. DiGennaro did not hear any more noise, and she looked out the window and saw an ambulance in front of the house. *Id.* at 142.   Mrs. DiGennaro "did not know what to think," and went back to her room. *Id.* Eventually, a man whom Mrs. DiGennaro thought was a fireman[10] came in the house, indicated that Albert had a heart attack, and asked if Albert had any medical problems. *Id.* Mrs. DiGennaro responded to his questions, but remained inside the house. Subsequently, a "man in a trenchcoat," Gates Police Lieutenant Gordon Whitehair ("Whitehair"), came into the house to talk with her. *Id.*   In that regard, upon learning of

---

[10]Apparently, it was actually VanBrederode who entered the house and asked Mrs. DiGennaro about Albert's health, after the ambulance arrived. *See,* VanBrederode Aff. [#78-3] at ¶ ¶ 48-53.

Albert's heart attack, Gates Police Chief David DiCaro had directed Whitehair to go to the residence and investigate the incident.   Whitehair took a written statement from Mrs. DiGennaro,[11] and then asked her to help him locate any videotape of the incident that might exist from a video camera that R.D. had mounted on the DiGennaro home. *Id*. at 143-144.[12]  Mrs. DiGennaro indicates that Whitehair talked her for a total of about "15 or 20 minutes," and then told her, "You better go see your husband," and drove her to the hospital. *Id*. at 144.  Whitehair estimates that the interview lasted "20 to 30 minutes," and indicates that Mrs. DiGennaro never asked to stop the interview or to see her husband. Whitehair Aff. [#79-3] at ¶ ¶ 8, 16.   At the hospital, staff informed Mrs. DiGennaro that Albert had died. Mary DiGennaro Dep. [#77-3] at 144, 148.

Albert was pronounced dead at 11:16 a.m. *See*, Docket No. [#90-1] at 25.  The following day, pathologist Paul Gosink, M.D. ("Gosink"), performed an autopsy.  Gosink determined that the cause of death was "hypertensive and arteriosclerotic cardiovascular disease." *Id*.   Gosink indicated that the "manner of death" was "homicide," stating: "The fact that Mr. DiGennaro was in a physical altercation with others immediately prior to his terminal collapse makes the recent physical altercation a contributory factor in his demise. Given this latter fact, the manner of death is therefore homicide." *Id*. at 29.  Gosink, though,

---

[11]The Amended Complaint [#52] at ¶ 35 asserts that, "Not only did Defendants prevent Mrs. DiGennaro from accompanying her critically ill husband to the hospital, Lt. Van Brederode subjected Plaintiff to additional rounds of questioning despite her severe emotional distress after witnessing Defendant's excessive and unnecessar[ily] rough treatment of her husband and his subsequent critical medical condition." However, based on Mrs. DiGennaro's own testimony, it is clear that she did not witness the incident, and that no one prevented her from accompanying her husband to the hospital.  Rather, it appears clear that she chose to remain inside the house even though, unbeknownst to her, Albert had already been taken to the hospital by ambulance.

[12]According to Whitehair, he reviewed the videotaped footage, but it showed only the DiGennaro's driveway and did not capture the events at issue here. Whitehair Aff. [#79-3] at ¶ 13.

found only minor injuries to Albert's body, describing them as "minor blunt force injuries, including small abrasions and contusions fo the trunk and extremities." *Id*. at 25.[13] Specifically, Gosink observed the following injuries: 1) a small "superficial abrasion" over the right clavicle; 2) a small "nearly vertical abrasion" on the lateral right mid chest; 3) four "superficial" "scratch marks" on the lateral left abdomen; 4) a ½ inch epidermal laceration of the right dorsal mid forearm; and 5) two "superficial abrasions" of the left ring finger. *Id*. at 27.  There were no injuries to Albert's head, face or neck. *Id*.

On August 29, 2007, Plaintiff commenced this action.  On February 25, 2011, Plaintiff filed the operative Amended Complaint [#52] against the following defendants: Town of Gates, Town of Gates Police Department, Police Chief David R. DiCaro, VanBrederode, Loomis, Bonferraro, and "John Doe Gates Police Department Personnel." Discovery is closed, and Plaintiff has never substituted anyone in place of the John Doe defendant.  Whitehair is not named as a defendant.

The Amended Complaint [#52] purports to set forth six separate causes of action: 1) a state-law claim for wrongful death against "defendants," based on the alleged use of excessive force against Albert, failure to seek prompt medical attention and failure to follow procedures; 2) a "4th Amendment battery and excessive force" against Van Brederode, Loomis, DiCaro and other "defendants" pursuant to § 1983, based on the alleged use of excessive force against Albert, deliberate indifference to Albert's medical needs and failure to perform a proper investigation after Albert's death ; 3) a state-law claim for "gross negligence" against "defendants," based on an alleged failure to take appropriate

---

[13]Gosink did note that Albert had fractured ribs consistent with having received chest compressions during CPR:  "The left third rib and the right fifth ribs are fractured anterolaterally, consistent with rescuscitative efforts."

13

measures to avoid injury to Albert;   4) a Fourth and Fourteenth Amendment negligent hiring, training, retention and supervision against the Gates Police Department and its employees, pursuant to § 1983, based on the alleged fact that the Police Department was aware that Van Brederode had dangerous propensities; 5) a Fourth Amendment abuse of process claim against the Gates Police Department and its employees, pursuant to § 1983, based on the alleged improper use of surveillance cameras to monitor the DiGennaro residence; and 6) a Fourth Amendment claim for unlawful seizure of Mary DiGennaro against Van Brederode, DiCaro and "other defendants," pursuant to § 1983, based on Defendants allegedly preventing Mrs. DiGennaro from accompany Albert to the hospital, and preventing her from leaving her home until after they had taken her statement.

On August 31, 2012, Defendants filed the subject motion [#77] for summary judgment.  Defendants' motion asserts the following points: 1) the only defendants involved in the use of force were Van Brederode and Loomis, and they acted reasonably as a matter of law; 2) Defendants were not deliberately indifferent to Albert DiGennaro's medical needs, because they promptly called an ambulance and then administered CPR;  3) there is no legally cognizable cause of action for a failure to investigate an alleged excessive use of force; 4) DiCaro and Bonferraro were not personally involved in the complained-of actions; 5) defendants are entitled to qualified immunity; 6) defendants did not proximately cause Mr. DiGennaro's death; 7) there is no legal basis to impose vicarious liability against the Town, the Police Department or DiCaro; 8) the negligent hiring and supervision claim lacks merit; 9) the Town of Gates is immune from punitive damages; 10) the Amended Complaint fails to state a claim for abuse of process; 11) the Amended Complaint fails to state a claim for illegal seizure of Mary DiGennaro; 12) the gross negligence claim must

14

be dismissed because Plaintiff is alleging intentional tortious conduct; and 13) the wrongful

death claim lacks merit.

Plaintiff opposed some but not all of the foregoing arguments.  Specifically, Plaintiff

contends that: 1) there are triable issues of fact as to the excessive force claim; 2)

defendants are not entitled to qualified immunity; 3) there are triable issues of fact as to

whether defendants were deliberately indifferent to Albert DiGennaro's medical needs; 4)

there are triable issues of fact as to whether defendants caused Albert DiGennaro's death;

5) there are triable issues of fact as to the *Monell* liability claim; 6) there are triable issues

of fact as to whether Mary DiGennaro was unlawfully seized; and 7) the negligence claim

may proceed on the claim that defendants were negligent in failing to provide proper

medical care to Albert DiGennaro.

On May 10, 2013, counsel for the parties appeared before the undersigned for oral

argument.  At oral argument, Plaintiff's counsel reiterated that, to the extent he did not

expressly respond to Defendants' arguments in his brief, he is not opposing them.

## DISCUSSION

At the outset, certain portions of Defendants' motion are unopposed, and the Court

will grant summary judgment as to them.  Specifically, Defendants are granted summary

judgment as to the following claims: 1) the claim alleging a failure to investigate; 2) the

claims against DiCaro and Bonferraro;[14] 3) the claim against the Gates Police

---

[14]Plaintiff's responding papers do not dispute Defendants' contention that Bonferraro and DiCaro were not personally involved in the alleged constitutional and state-law torts.  Plaintiff does argue that there are issues of fact that preclude summary judgment against unspecified "defendants in their official capacities." Pl. Memo of Law at 15.  On this point, though, Plaintiff seems to conflate the issues of official capacity claims, supervisory liability claims and *Monell* liability claims.  Plaintiff's argument on this point actually alleges a municipal policy or custom, and therefore pertains to a *Monell* liability claim, which the Court discusses below. Plaintiff is not seeking prospective injunctive relief, and any official capacity claim would essentially be a claim
(continued...)

Department;[15] 4) the punitive damages claim against the Town of Gates; and 5) the claim

for abuse of process.  Furthermore, while the Amended Complaint purports to assert a

wrongful death claim for failure follow proper police procedures, there is no evidence in the

record that Defendants failed to follow proper police procedures, or that such failure

resulted in injuries to anyone.  Accordingly, Defendants are entitled to summary judgment

on that claims as well.  The following remaining claims are being asserted against

VanBrederode and Loomis, individually, and/or against the Town of Gates: 1) a wrongful

death claim for excessive force; 2) a wrongful death *Monell* claim against the Town of

Gates arising from the alleged excessive force, based on the Town's alleged awareness

of VanBrederode's propensity to use excessive force;  3) a wrongful death claim for

deliberate indifference to serious medical needs; 4) a wrongful death negligence claim for

failure to provide medical care; and 5) a Fourth Amendment wrongful seizure claim by Mrs.

DiGennaro.

### Rule 56

Summary  judgment may not be granted unless "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled

to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary judgment

bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes*

---

[14](...continued)
against the Town of Gates and would be redundant.

[15]Plaintiff has not disputed Defendants' contention that the Town of Gates, and not the  Gates Police Department, is the correct party.  *See, e.g., Hayes v. County of Sullivan*, 853 F.Supp.2d 400, 438 (S.D.N.Y. 2012) (Holding that "the weight of authority supports the view that" where claims are asserted both against a municipality and a municipal agency, the claim against the agency should be dismissed as redundant.).

*v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), cert denied, 517 U.S. 1190 (1996).

The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

Significantly, in applying the foregoing principles, a court need not accept witnesses characterizations of events that are contradicted by videotape, where, as here, the non-moving party does not dispute the authenticity of the videotape. *See, Arnold v. Westchester County*, No. 09 Civ. 3727(JSR)(GWG), 2012 WL 336129 at * (S.D.N.Y. Feb. 3, 2012) ("In instances where the videotape clearly contradicts Arnold's version of events, we have disregarded Arnold's version on the ground that a reasonable juror could not credit Arnold's version in the face of the videotape evidence.") (collecting cases); *Cameron v. City of New York*, 598 F.3d 50, 60 (2d Cir. 2010) ("When a movant presents incontrovertible evidence such as a relevant videotape whose accuracy is unchallenged,

17

we will grant the movant's motion for judgment as a matter of law if that evidence so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.") (citations and internal quotation marks omitted).

This principle is particularly relevant to Stacy Head's deposition testimony, which, as already discussed above briefly, is contradicted by the videotape in certain respects. Head's testimony is crucial to Plaintiff's case, since she is the only one of Plaintiff's witnesses who can claim to have actually witnessed the use of force against Albert.  Albert cannot, since he died shortly afterward.  R.D. cannot, since he was somewhere inside the house.  Plaintiff cannot, because she was in her bedroom.  As for Head, she was across the street, observing the incident through an upstairs window.

Regarding what she claims to have seen, Head testified at deposition, approximately three years after the incident, in pertinent part, as follows:

> I went straight to my right window of my house, which is the one that's closest to theirs and I just saw lots of police officers, like running to and fro. And I saw that at first and then I noticed two or three officers at the front door talking with Mr. DiGennaro. . . . I'm pretty sure the first thing I saw were the men running around like the side of the house and they were kind of all like surrounding it.  And a few were doing that and then they made their way to the door.  You know, it might have been because I was just waking up, but I did not see them break, you now, down the door, but I did see Albert dialoging with two police officers or three – I'm not sure – that were at the door.  And he wasn't being aggressive, but he didn't want to let them into the house.  He [was] standing at the doorway . . . talking to them, yes.  I couldn't hear their exact words, but it was apparent, like through the body language, that they obviously wanted to get in and he wasn't letting them.  And so basically they talked for a few more minutes and then they grabbed onto his arms and dragged him down the stairs and threw him on the ground. . . . It was a lot of force. . . . I don't know if it was just one police officer that threw him.  I think it was just one or maybe two that were like around him when he was thrown down on the ground.
>
> And then, just at that point [R.D.] had come out of the house.  And I didn't see where [R.D.] came from, like the front door or back door – I don't know.

But I saw [R.D.] running around, you know, running away from the cops who were chasing after him.  At that point my attention turned to [R.D.], but I would look back and forth between [R.D.] and Mr. DiGennaro on the ground.  And Mr. DiGennaro was trying to get up and he kept saying, 'I'm handicapped.  Give me my cane.  You guys are heartless.  I'm going to have a heart attack.'  He even said 'I'm going to have a' – he was in a lot of pain, obviously.  . . .  [W]hen he kept saying – it was a few minutes he dept saying – or maybe more than a few minutes, but it felt like a while.  He kept saying like, 'Give me [my] cane.  I need to stand up.  Give me my cane.' . . .

[After Albert slumped over, R.D.] was getting nervous about his dad.  And I mean, he was saying stuff like, you know, 'I'm going to sue your 'F'ing A. [sic] My dad's going to have a heart attack.'  And unfortunately he seemed almost happy about it because he was, you know, just a – he's a strange character, but anyhow.  So he was yelling at the police officers, [R.D.] was, while all this was happening.  So a lot of drama was happening with [R.D.] at this time.  Someone I think kicked [R.D.'s] knee or somehow got [R.D.] down on the ground, handcuffed him and put him in their police car.  . . .

And, you know, I know at some point someone did CPR on [Mr. DiGennaro], but it felt like a very long time because  – well, I should back up a little bit.  So they took [R.D.] into the [police] car.  And you look over and at that point – because they were paying so much attention to [R.D.] – they realized, and I realized at that point, that [Mr. DiGennaro] wasn't moving.  And then you could tell everyone got really nervous and didn't know what to do at first.  There was a few minutes of I don't know what to do, just standing around him.  And then I think at one point they realized now they have to do something.  But I didn't see CPR happen for a while after he was down.  . . . .  I don't recall what [medical] equipment anyone had.  I just saw a bunch of equipment, so I don't know exactly what was going on.  Because there were two or three people around Albert at that time, so I couldn't see what they were doing.  But yeah.  They were trying to work on him.  . . .  It was a while [until the ambulance came].  I couldn't believe it.  . . .  I don't want to say that I know if I don't, but it was at least – I know it was more than 10 minutes, maybe even more than 15. . . .

[When I began watching the incident,] I just saw [Mr. DiGennaro] at the door.  [I did not observe Mr. DiGennaro open the door and then close it].[16]  [When I began watching,] I saw some police officers in the yard, on the left side of the house and the right side of the house.  And then I saw, I think – I'm not sure how many, but I think two at the door.  . . .  I think there was four or five total. . . .  [Mr. DiGennaro]  was standing in the doorway, not letting them in.  . . .  There was no way for the police to get around.  . . .  I didn't hear any

---

[16]See, [#90-1] at 11, deposition p. 52.

specific conversations.  I just – I kind of inferred what was going on by their body language and everything.  [I did not see the officers force open the door].[17]  [I had a clear view of the front door.][18]  . . .  I didn't see the door [forced] and I didn't see [Mr. DiGennaro] pepper sprayed.  . . .  Because, you know, the officers' backs were to me and – yeah.  So I didn't see anything happen.  . . .  I was just apparent that through words they were trying to get him out at first and then when that didn't work, they just physically grabbed him and pulled him down the stairs and then threw him down.  So I don't recall any gentle, physical, you know, encouragement to get [him] out at first.  . . .  [I did not see the officers  make any effort to try to pull Mr. DiGennaro out of the house before they were actually able to do that.][19]  . . .

[After Mr. DiGennaro was handcuffed,] [t]here was a lot going on at this point because [R.D.] had just come out and was making a big scene.  I don't recall where the one officer went, but I do remember that there wasn't anyone around Albert for a very long time.  And after he started to have trouble and start yelling and stuff, there still wasn't anyone around him.  He was yelling for the – you know, 'I want my cane.  I'm handicapped.  You're heartless.'  And I think at that point, one officer went and stood near Albert, but they didn't help him or anything.  The just stood next to him.  . . .  I saw a police officer chasing [R.D.] out of the house.  . . .  [R.D.] was trying to get away from being arrested.  Sure.  He was running . . . like towards the road.  . . .  [T]wo [officers] took [R.D.] down, so, yeah.. It was about two and I think a third one was just surrounding the area[.]  . . .  So Albert goes into a heart attack.  [R.D.] is screaming, yelling.  That probably happened all at once and then a minute later he was taken down on the ground and put into the police car.  And then I would say a long five, ten minutes maybe, that's when they started to administer CPR.

Head Dep. [#90-1] at 4-5, 11-14.

Significantly, many crucial details of this testimony are contradicted by the videotape.  On this point, the aspects of Head's testimony that are refuted by the videotape are as follows: 1) there were two officers at the DiGennaro's door, not three; 2)  there were not five officers, nor were there officers surrounding the house or on the right side of the

---

[17]*Id*. at 12, deposition at 54.

[18]*Id*., deposition at 55.

[19]*Id*., deposition at p. 60.

house; 3) R.D. did not run out of the house by himself, nor was he free to run toward the road, rather, he was led out of the house by VanBrederode and then immediately handcuffed; 4) Albert was not left alone at any point after being brought out of the house; 5) there were not "minutes" of "standing around" after Albert went into distress; 6) it did not take ten or fifteen minutes for the ambulance to arrive; 7) it did not take five or ten minutes for VanBrederode to commence CPR.

Additionally, Head's testimony points out the limits of her claimed ability to see and hear what occurred.  In this regard, Head claims the VanBrederode and Loomis were standing on the porch with their backs toward her, which would put them between her and the doorway.   Furthermore, Head indicates that she did *not* witness any of the following: 1) VanBrederode kicking in the door, which is plainly visible on the videotape; 2) VanBrederode using pepper spray;  3) any conversation between the officers and Albert at the doorway; and 4) any effort to pull Albert out of the house before he was actually brought out.   It is also apparent that Head is not in a position to deny VanBrederode's sworn statements that he radioed for emergency medical assistance immediately upon seeing that Albert was in distress.   With these points in mind, the Court will consider the various causes of action.

*The Wrongful Death Claims*[20]

The first claim is for excessive force under § 1983, and the applicable law concerning alleged excessive force by police officers is clear:

> To establish a section 1983[21] claim for excessive force, a plaintiff has the burden of showing that, under the Fourth Amendment, the use of force was objectively unreasonable in light of the facts and circumstances confronting the officers, without regard to the officers' underlying intent or motivation. This determination requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Burke v. Cicero Police Dept.*, No. 5:07–CV–624 (FJS/DEP), 2011 WL 1232107 at *5 (N.D.N.Y. Mar. 30, 2011) (citations and internal quotation marks omitted); *see also, Weather v. City of Mount Vernon*, No. 11–1567–cv, 474 Fed.Appx. 821, 823 (2d Cir. Apr. 11, 2012) ("In *Graham v. Connor*, the Supreme Court held that a reasonableness standard applied to Fourth Amendment excessive force claims. 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The Court indicated that three factors to consider in assessing reasonableness include: 'the severity of the crime at issue, whether the suspect poses an

---

[20]In New York State, "there is no common-law right to maintain a wrongful death action," rather, "the right to maintain such an action is purely a creature of statute," namely, Estates Powers & Trust Law ("EPTL") § 5-4.1. *See*, *Barry & Sons, Inc. v. Instinct Productions LLC*, 15 A.D.3d 62, 65, 788 N.Y.S.2d 71, 73 (1st Dept. 2005). Wrongful death is not itself an independent tort. Rather, "[t]his cause of action may be maintained only to the extent that a cognizable *underlying tort* is pleaded under section 5-4.1(1) of the Estate Powers and Trusts Law (see also *Prink v. Rockefeller Center, Inc.*, 48 N.Y.2d 309 [1979] )." *McKenzie v. Cleary, Gottlieb, Steen & Hamilton*, 1994 WL 150139 at *2 (N.Y.Sup. Mar. 22, 1994) (emphasis added), *aff'd*, 220 A.D.2d 251, 632 N.Y.S.2d 98 (1st Dept. 1995); see also, *Bongiorno v. D.I.G.I., Inc.*, 138 A.D.2d 120, 127, 529 N.Y.S.2d 804, 808 (2d Dept. 1988) (Indicating that the wrongful death statute "does not purport to create *an independent, actionable wrong* where none before existed, but instead, furnishes *a means of recovery* to a limited class of statutorily designated distributees who have sustained pecuniary loss by virtue of the decedent's death.") (emphasis added).

[21]"In order to state a cause of action under 42 U.S.C. § 1983, a plaintiff must allege that some person acting under color of state law deprived him of a federal right." *Washington v. James*, 782 F.2d 1134, 1138 (2d Cir.1986).

immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' *Id*.").

"Physical force is often necessary when effectuating arrests or executing search warrants and, thus, not every push or shove is unconstitutionally excessive, even if it may later seem unnecessary in the peace of a judge's chambers." *Stokes v. City of New York*, No. 05-CV-0007 (JFB)(MDG), 2007 WL 1300983 at *10 (E.D.N.Y. May 3, 2007) (citation and internal quotation marks omitted).  On the other hand, it is clear that "officers may not gratuitously inflict pain in a manner that is not a reasonable response to the circumstances." *Stokes v. City of New York*, 2007 WL 1300983 at *10 (citation and internal quotation marks omitted).

Plaintiff here contends that VanBrederode and Loomis used excessive force when arresting Albert.[22]  Specifically, the excessive force is alleged to have occurred when the officers "unnecessarily dragged  Albert DiGennaro from his house and forcefully threw him on the ground," "given [Albert's] obvious advanced age and physical condition." Pl. Memo of Law [#90-4] at 3; *see also, id*. at 6 (Reiterating that the alleged excessive force consisted of "dragging him down the stairs and forcefully throwing him on the ground.").  Plaintiff does not dispute that Albert was obstructing the officers' efforts to arrest R.D.,[23]  nor does she

---

[22]It is clear from the record that neither of the other two individual defendants, David DiCaro and Carl Bonferraro, were personally involved in the alleged use of force against Albert.

[23]According to Plaintiff, "it is undisputed that Albert DiGennaro was not cooperating with the police when they were attempting to break down his door.  However, once the door was broken down and he was pepper-sprayed and seized by the defendant officers in the house, there is no evidence that Albert DiGennaro offered any *meaningful* resistance to the police." *Id*. at 5-6 (emphasis added). Plaintiff states that if Albert "did offer some resistance at this juncture," it must be "analyzed in the light of the realities of his physical condition." Pl. Memo of Law [#90-4] at 6.  However, the record indicates that despite Albert's medical problems, he was vigorously opposing the officers' efforts to force open the door.

claim that the officers' actions in breaking down the door and pepper-spraying Albert constituted excessive force.[24]

In support of the excessive force claim, Plaintiff relies on essentially three key pieces of evidence: 1) the fact that Albert died; 2) the coroner's determination that the nature of Albert's death was homicide; and 3) Stacy Head's deposition testimony that the officers "threw" Albert on the ground.  However, on this point, the mere fact that Albert died immediately following the use of force does not tend to establish that the force used was excessive, where, as here, the officers had no reason to know of Albert's latent heart disease prior to the use of force. *See, Sanchez v. Port Authority of New York and New Jersey*, No. 08-CV-1028 (RRM)(CLP), 2012 WL 1068078 at *9 (E.D.N.Y. Mar. 29, 2012) ("The reasonableness of the force used may be assessed in the light of the officer's knowledge of a preexisting injury.  *However, reasonable force does not become un-constitutional merely because it caused the plaintiff serious injury.*  Where officers are unaware of a prior injury, in the absence of allegations otherwise constituting excessive force, no constitutional violation exists.") (citations and internal quotation marks omitted) (emphasis added).  The fact that Albert died of a heart attack shortly after being placed on the lawn cannot, without more, convert an otherwise uneventful arrest into a constitutional violation.

Similarly, the coroner's classification of manner of death as being "homicide" does not suggest excessive force. Rather, Gosink's report explains that the manner of death was

---

[24]The Amended Complaint contends that the use of pepper spray was part of the alleged excessive force, but Plaintiff now seems to have abandoned that assertion. *See*, Amended Complaint ¶ 46.  In any event, the Court finds that under the circumstances presented here, VanBrederode's use of pepper spray, which seemingly had no effect on Albert, was not excessive force.

homicide because Albert was involved in a physical altercation, *i.e.*, a use of force, immediately prior to his death.   Although Gosink indicated that the altercation was a contributory factor in Albert's death from heart disease, he did not attempt to quantify the force used.   Gosink's report, though, details only very minor and superficial physical injuries.   Accordingly, no reasonable inference of excessive force can be drawn from Gosink's report.

Plaintiff alternatively contends that Stacy Head's contention, that the officers "threw" Albert on the ground forcefully, creates a triable issue of fact.[25]   As already discussed at length, that contention is inconsistent with the Court's view of the videotape evidence, as are many other points of Head's testimony.   However, even accepting Head's contention that VanBrederode and Loomis "threw" Albert on the ground, the Court still concludes that there is not a triable issue of fact as to excessive force.

In that regard, the Court applies the factors set forth above, and finds, first, that the crime for which Albert was being arrested was Obstructing Governmental Administration in the Second Degree, in violation of New York Penal Law § 195.05, a Class A misdemeanor, which is not an insubstantial crime.   Plaintiff suggests that such offense is not serious, since a misdemeanor is "the lowest level of crime under New York law." Pl. Memo of Law [#90-4] at 5.   Viewing the totality of the circumstances, though, Albert committed the crime by actively interfering with police officers under circumstances that posed an immediate threat to their safety.   That is, by hindering the officers from lawfully

---

[25]Plaintiff contends that the excessive force consisted of the officers both "dragging" him down the stairs and "throwing" him onto the ground.   To the extent that Plaintiff contends that the officers' action in walking Albert down the steps amounts to "dragging," the Court disagrees.   There is no indication that Albert suffered any injury whatsoever while being taken down the stairs.

arresting R.D., Albert took an already dangerous situation, involving the arrest of a hostile, mentally ill man with access to rifles, inside his home, and made it even more dangerous by keeping the officers in an exposed position on the porch.  It was entirely reasonable for the officers to seek to remove Albert from blocking the door by pulling him down the steps and placing him on the lawn.  Although Head opines that the officers were too rough, the coroners's objective findings do not support the claim that Albert was thrown down with great force.  In that regard, while Plaintiff insists that Albert was thrown, facing down, with such force that he "bounced," there were absolutely no injuries to his head, face, neck or legs, and no significant abrasions or bruising on his arms, chest or abdomen.[26]  It is also significant that, despite supposedly being thrown down with great force, Albert seemed rather unfazed, at least until he suffered the heart attack, which was not foreseeable.[27]  That is, he continued to resist the officers, by refusing to allow Loomis to handcuff him, and by verbally berating the officers, calling them "heartless" and demanding that they give him his cane.  Furthermore, while Plaintiff focuses on Albert's "advanced age and physical condition," it is clear that those factors did not prevent him from mounting vigorous physical opposition to the officers, which in turn entitled them to use reasonable force.  For all of the foregoing reasons, the Court concludes that Plaintiff has not demonstrated a triable issue of fact as to excessive force on the facts presented here.

---

[26] *See, Wims v. New York City Police Dept.*, No. 10 Civ. 6128(PKC), 2011 WL 2946369 at *5 (S.D.N.Y. Jul. 20, 2011) (Granting 12(b)(6) dismissal where plaintiff alleged that he was thrown "flat on [his] face unto the filthy ground [pavement]": "There is no assertion that having been "thrown flat on [his] face unto the filthy ground" resulted in any specific or identifiable physical or mental injury and harm beyond a conclusory assertion which, standing alone, is insufficient under *Twombly* and *Iqbal*.") (citation omitted).

[27] Additionally, Plaintiff has not presented any medical evidence to suggest that it was the act of being thrown to the ground that triggered the heart attack, as oppose to the general excitement of the situation or something else.

Alternatively, even assuming *arguendo* that the force was excessive, the Court finds

that VanBrederode and Loomis are entitled to qualified immunity.

> Qualified immunity exists to protect government officials from liability for civil damages that arise from the reasonable execution of their official duties. *Pearson v. Callahan*, [555] U.S. [223], 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009). A qualified immunity defense is available when "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir.1998). "Clearly established" means more than a generalized protection found within the constitution-the law in question must be particular enough to give the government officials "fair warning" that their behavior is over the line. *Hope v. Pelzer*, 536 U.S. 730, 740-41, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).
>
> Excessive force is evaluated through Fourth Amendment doctrine, and we examine whether the force was excessive under an objective standard of reasonableness. *Stephenson v. Doe*, 332 F.3d 68, 77 (2d Cir.2003). Even if the force is objectively unreasonable, an officer may still be eligible for qualified immunity if it was objectively reasonable for the officer to believe that her action did not violate clearly established law. *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir.1996). Qualified immunity protects officers "from the sometimes hazy border between excessive and acceptable force." *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (internal quotation marks and citation omitted).
>
> When we examine officers' use of force, we must make "allowance[s] for the fact that the police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). We assess those circumstances through careful examination of the facts of the particular arrest, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396, 109 S.Ct. 1865.

*Keene v. Schneider*, 350 Fed.Appx. 595, 596, 2009 WL 3463892 at *1 (2d Cir. Oct. 29,

2009).  Based on the entire record as discussed above, the Court finds that VanBrederode

and Loomis are entitled to qualified immunity.

The Court further finds that the Town of Gates is entitled to summary judgment on the *Monell* claim, which is connected to the excessive force claim.   The general legal principles concerning *Monell* liability are well settled:

> Under the standards of *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality. Absent such a custom, policy, or usage, a municipality cannot be held liable on a respondeat superior basis for the tort of its employee.

*Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citations omitted).

Although it is a difficult standard to meet, a plaintiff may show that a municipality's failure to act, such as in the case of a failure to discipline rogue police officers, may constitute an official policy. *See, Turpin v. Mailet*, 619 F.2d 196, 201 (2d Cir. 1980) ("[W]here senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts.  Although that standard is undoubtedly difficult to meet, we cannot say as a matter of law that failure to act may never give rise to an official policy within the meaning of *Monell*.") (citations and footnote omitted).  "An even stronger case for imposing liability for inaction occurs when the municipality fails to remedy a specific situation, the continuation of which causes a deprivation of constitutional rights," such as a continuing pattern of behavior by a particular police officer. *Id.*, 619 F.2d 201 at n. 5.  However, a municipal *policy* cannot be inferred from a failure to discipline "a single police officer for a single incident of illegality such as a first arrest without probable cause or with excessive use of force," though a "single, unusually brutal or egregious beating

administered by a group of municipal employees may be sufficiently out of the ordinary to warrant an inference that it was attributable to inadequate training or supervision amounting to deliberate indifference or 'gross negligence' on the part of officials in charge. *Id*. at 202.

In the instant case, the Amended Complaint indicates that the Town of Gates/Gates Police Department is guilty of "negligent hiring, training, retention and supervision" of police officers. Amended Complaint ¶ 60.  The Amended Complaint further alleges that the Gates Police Department "knowingly employed [and] retained . . . law enforcement officers with known dangerous propensities." *Id*. at ¶ 57.   In response to Defendants' summary judgment motion, though, Plaintiff has narrowed those broad allegations, and now contends only that "the municipal defendants had a policy of negligent hiring and retention *with specific reference to Lt. Van Brederode*." Pl. Memo of Law [#90-4] at 16 (emphasis added).  Moreover, to establish that claim, Plaintiff relies on a single incident from 1993, in which a citizen alleged that during an arrest, "Van Brederode choked her and threw her into a wall in her house." *Id*.  The complaining citizen, Mary Lou Parks ("Parks"), a female who was attempting to prevent Van Brederode from arresting her daughter at their home, claims that VanBrederode choked her, threw her into walls, and "knee kicked" her in the back while handcuffing her. *See*, Mary Lou Parks Dep. [#90-2] at 78-81, 92.   Van Brederode indicates that he used force to arrest Parks after she blocked his way and pushed against him. Van Brederode Dep. [#90-2] at 69.  Specifically, he indicates that he pushed Parks down a hallway in order to enter the house in pursuit of the daughter, making contact with her neck, and that Parks fell to the ground. *Id*. at 70-71.  Parks did not file a complaint with the Gates Police Department, though she did commence a civil action in this

Court, which the parties settled on undisclosed terms. *See, Docket sheet, Parks v. Town of Gates, et al.*, 96-CV-6446 CJS.

It is undisputed that as of the date of the incident that is the subject of the instant lawsuit, November 1, 2006, Van Brederode had been a police officer for approximately 20 years, and had never been the subject of police department disciplinary action. DiCaro Aff. [#78] ¶¶ 7-10.  It is further undisputed that Van Brederode's personnel file contained only one complaint, concerning "an allegation of discourteous conduct in 1998 which was found [by the Gates Police Department] to be without merit." *Id*. at ¶ 11.

The Court has already concluded that VanBrederode is entitled to summary judgment on the excessive force claim, and the *Monell* claim must therefore also fail. However, even assuming *arguendo* that VanBrederode had used excessive force against Albert, the Town would nevertheless be entitled to summary judgment on the *Monell* claim. On this point, the fact that Parks made a single unproven allegation of excessive force against VanBrederode some thirteen years prior to the incident at issue is insufficient to raise a triable issue of fact as to the existence of a municipal policy or practice tolerating police brutality. *See, Genovese v. Town of Southhampton*, — F.Supp.2d — , 2013 WL 420105 at *13 (E.D.N.Y. Feb. 1, 2013) ("[E]ven if Iberger had committed excessive force in the past, a policy cannot ordinarily be inferred from the failure of those in charge to discipline a single police officer for a single incident of illegality.") (*citing Turpin v. Mailet*, 619 F.2d 196, 202 (2d Cir.1980)); *Watts v. City of Hartford*, No. 3:00CV0681 (RNC), 2004 WL 717132 at *5 (D.Conn. Mar. 31, 2004) ("To the extent that one complaint lodged and subsequently withdrawn against Allan was improperly classified as 'bad judgment,' rather

than excessive force, a single incident is insufficient to establish a policy of inadequate discipline.").

Moreover, although the defendant officers' use of force may have been a contributing factor to Mr. Digennaro's death, it clearly was not so "brutal or egregious" as to suggest a level of inadequate training amounting to deliberate indifference.  In that regard, despite Albert's age, he initiated the use of force by vigorously impeding the officers' lawful efforts to arrest R.D., who, in addition to being mentally unstable and hostile toward the police, had access to multiple rifles.  Moreover, while witnesses' subjective descriptions of the force used varies, the autopsy report indicates that, but for Albert's latent coronary disease, he would have weathered his arrest with only minor abrasions.  Accordingly, the municipal defendants are entitled to summary judgment on the *Monell* claim.[28]

Plaintiff next contends that defendants violated Albert's federal constitutional rights by being deliberately indifferent to his serious medical needs after he suffered a heart attack.  The Court construes this claim as being against VanBrederode, since there is no indication that anyone other than VanBrederode was in a position to affect Albert's medical care during the critical time between when he collapsed and when the fire department and ambulance arrived.  Accordingly, to the extent that Plaintiff maintains that any other

---

[28]The Amended Complaint [#52] appears to only assert the *Monell* claim in connection with the allegations of excessive force.  To the extent that Plaintiff could also be attempting to assert a *Monell* claim in connection with the alleged deliberate indifference to Mr. DiGennaro's medical needs, there is similarly no evidence of a municipal policy or practice condoning the denial of medical care to arrestees.

31

individual defendant was personally involved the events concerning Albert's medical care, the Court disagrees based on the undisputed record.[29]

In considering whether VanBrederode was deliberately indifferent to Albert's medical needs, the legal standard is clear:

> An individual who is in police custody and in serious medical need has a right, pursuant to the Due Process Clause of the Fourteenth Amendment, to receive medical treatment, and a detaining officer's deliberate indifference to such a need is actionable. *See Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir.2009). There are two elements to this claim: (1) plaintiff must have experienced a "serious medical condition," and (2) the custodial officer must have treated this condition with deliberate indifference. *Id*. at 72.

*Larsen v. Rainone*, Civil Action No. 3:09–CV–287 (JCH), 2010 WL 4876084 at *3 (D.Conn. Nov. 17, 2010). "The obligation of the police to provide necessary medical treatment upon request by a detainee or based upon the obvious need for treatment is satisfied when the police summon medical assistance; they have no duty to provide that assistance themselves[.]" *Rasmussen v. City of New York*, 766 F.Supp.2d 399, 414 (E.D.N.Y. 2011); *see also, Chavis v. City of New York*, 94 A.D.3d 440, 443, 941 N.Y.S.2d 582, 585 (1st Dept. 2012) ("[T]he NYPD patrol guide . . . directs that upon encountering an injured person requiring medical assistance, an officer should '[r]equest an ambulance ... if necessary' and '[w]ait in view to direct the ambulance' (Patrol Guide Procedure No. 216–01)"); *Zipoli v. Caraballo*, 603 F.Supp.2d 399, 404 (D.Conn. 2009) ("The Supreme Court has stated that the Due Process Clause requires the government to provide medical care to persons injured while being apprehended by police. The constitutional obligation is met by seeing that the arrestee is taken promptly to a hospital that provides the treatment necessary for

---

[29]Loomis was not involved with Albert's medical emergency, because he was busy attending to R.D., and was not in a position to render assistance. There is no indication that DiCaro or Bonferraro were involved in Albert's medical emergency.

his injury.") (citations and internal quotation marks omitted).  Therefore, a police officer is not constitutionally required to perform CPR.  *See, Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006) ("[A] police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment, even if the officer did not administer CPR."); *DiPace v. Goord*, 308 F.Supp.2d 274, 284 (S.D.N.Y. 2004) ("Given the expected imminent arrival of medical personnel, . . . it might not be the case that the Constitution imposes th[e] obligation [to perform CPR] on an individual officer under the circumstances in which CO Krause found himself.").

In this case, the undisputed record indicates that VanBrederode immediately summoned medical assistance upon observing that Albert was in medical distress. Moreover, he personally administered chest compressions until medical assistance arrived. Stacy Head's testimony to the contrary is obviously refuted by the videotape, and in any event, Head is not in a position to deny VanBrederode's sworn testimony that he immediately summoned medical assistance, which is supported by the fire department's call records.  R.D.'s conclusory and self-serving contention that VanBrederode did nothing to help Albert is contradicted by R.D.'s own observations and by the videotape and call records.  Accordingly, VanBrederode is entitled to summary judgment on the medical deliberate indifference claim.

Plaintiff next contends that defendants were negligent with regard to Albert's medical care.  In that regard, the Amended Complaint alleges that "defendants" were grossly negligent because they breached a duty to arrest R.D. without endangering the rest of the family, and that such breach was a proximate cause of Albert's death.  Defendants argue, somewhat cursorily, that such claim must fail, since Plaintiff is alleging that

33

defendants engaged in intentional conduct, namely excessive force, which precludes a claim for negligence.   Plaintiff responds by agreeing that Defendant's argument is "generally correct," with regard to the alleged excessive force. Pl. Memo of Law [#90-4] at 18.   The Court agrees. *See, e.g., Epps v. City of Schenectady*, No. 1:10–CV–1101 (MAD/CFH), 2013 WL 717915 at *6 (N.D.N.Y. Feb. 27, 2013) ("If the plaintiff alleges intentional conduct in support of a claim for excessive force or battery, he may not also base a claim for negligence on that same conduct.") (citation omitted).   However, Plaintiff maintains that she can still maintain a negligence claim regarding "the negligence of the defendants in failing to provide adequate medical care to [Albert]." Pl. Memo of Law [#90-4] at 18.

Specifically, Plaintiff contends that "there is testimony that the defendants delayed in giving Mr. DiGennaro CPR and calling an ambulance." *Id*.   However, for the reasons already discussed, the Court finds that Plaintiff has not raised a triable issue of fact as to whether VanBrederode failed to promptly request emergency medical care for Albert.[30] Accordingly, Defendants are entitled to summary judgment on the negligence claim.

For all the reasons discussed above, Defendants are entitled to summary judgment on all of the wrongful death claims.

### *Arrest/False Arrest of Mary DiGennaro*

In addition to the torts allegedly committed against her husband, Plaintiff alleges that Defendants unlawfully seized her, or falsely arrested her, in violation of the Fourth Amendment, by confining her in her house rather than allowing her to go to the hospital to

---

[30]In making this determination, the Court is aware that negligence requires a lesser showing than deliberate indifference.

be with Albert in his last moments. "The elements of a claim of false arrest under § 1983 are substantially the same as the elements of a false arrest claim under New York law," and are as follows: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Maron v. County of Albany*, 166 Fed.Appx. 540, 541 (2d Cir. Feb. 13, 2006) (*citing Singer v. Fulton County Sheriff*, 63 F.3d 110 (2d Cir. 1995)).

At the outset, to the extent that Plaintiff now contends that any defendant or other officer prevented her from actually accompanying her husband to the hospital, such claim is belied by the record. Specifically, Mrs. DiGennaro indicated that she intentionally remained inside her house, alone, even after she observed the ambulance outside her house, and even after being told that her husband had a heart attack. *See,* [#77-3] at 141-142. In fact, Mrs. DiGennaro states that she remained inside for "a long while." Mary DiGennaro Aff. [#90-2] at p. 74. On this point, the record indicates that VanBrederode removed R.D. from the house at 10:30 a.m., Albert began having a heart attack at 10:31, and Lieutenant Whitehair, who supposedly detained Mrs. DiGennaro, did not arrive at the scene until 10:52, at which time Mrs. DiGennaro was still inside by herself. It is unclear whether the ambulance transporting Albert was even still at the residence when Whitehair arrived, although it appears that even if it was, it left almost immediately thereafter.

Upon arriving at the house, Whitehair went inside and spoke to Mrs. DiGennaro for "about 15 or 20 minutes." *Id*. at 144. Mrs. DiGennaro indicates that she felt that she needed to answer Whitehair's questions, even though she also felt that she should go see her husband at the hospital. For example, at deposition, Mrs. DiGennaro stated, "I was

wanting to see him," presumably meaning her husband, "but I had to answer all those questions." *Id*. Similarly, in her affidavit submitted in opposition to Defendants' summary judgment motion, she states: "I wanted to be with my husband, but Lt. Whitehair insisted on asking me a lot of questions about Albert's health and heart problems. . . . I wanted to go and be with him, but I felt that I cold not go because Lt. Whitehair insisted on questioning me until he later released me." Mary DiGennaro Aff. [#90-2] at p. 75. However, Mrs. DiGennaro's carefully-worded suggestion that Whitehair eventually "released" her begs the question, which is whether she was ever seized in the first place. That question must be answered in the negative.

At the outset it is clear that "not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *U.S. v. Mendenhall*, 446 U.S. 544, 552, 100 S.Ct. 1870, 1876 (1980) (citation omitted). "As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy[.]" *U.S. v. Mendenhall*, 100 S.Ct. at 1877. Consequently, "[w]hether a seizure occurred is determined by asking whether a reasonable person would have felt free to leave." *Brown v. City of Oneonta, New York*, 235 F.3d 769, 775 n. 2 (2d Cir. 2000). On this issue,

> [e]xamples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between

36

a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*U.S. v. Mendenhall*, 100 S.Ct. at 1877.

"Because the seizure determination is a question of law, it follows *a fortiori* that ascertaining reasonableness is also a question of law." *Brown v. City of Oneonta, New York*, 235 F.3d at 775 n. 2.  "[A] [party's] subjective belief that he was not free to leave is irrelevant; rather, the question is what a reasonable person would have believed." *U.S. v. Connelly*, No. 05-CR-6166 CJS, 2007 WL 3124538 at *8 (W.D.N.Y. Oct. 25, 2007) (citation omitted).  "Moreover, absent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial." *Id.* (citation omitted).

In this action, the undisputed facts are as follows:  1) after observing an ambulance outside her house and being advised that he husband had suffered a heart attack, Mrs. DiGennaro remained inside her home "a long while," though nothing prevented her from going outside and being with her husband;[31] 2) eventually Lieutenant Whitehair, who was in plain clothes and wearing a trenchcoat, came inside the house and asked her questions for approximately twenty minutes; 3) there is no indication that Whitehair was visibly armed, that he made any physical contact with Mrs. DiGennaro or that he used a threatening tone of voice; 4) Whitehair never told Mrs. DiGennaro that she could not leave

---

[31]Mrs. DiGennaro's claim is premised on the idea that Defendants prevented her from being with her husband in his final moments.  However, any suggestion by Plaintiff that she was attempting to leave the house to see her husband when she was accosted by Whitehair, is simply belied by the record.  It may be, understandably, that Mrs. DiGennaro's inaction immediately following Albert's heart attack was due to shock.  But in any event, there is no indication that she was attempting to leave the house prior to Whitehair's arrival.  Rather, the impetus for her leaving the house seems to have been Whitehair's suggestion that she accompany him to the hospital.

her own home;[32] and 5) Mrs. DiGennaro  never asked Whitehair to postpone the interview, to terminate the interview or to allow her to leave.  On these facts, the Court finds that any reasonable person in Mrs. DiGennaro's position would have felt free to leave the residence and go to the hospital.

Moreover, even assuming *arguendo* that a seizure occurred, it was committed by Whitehair, who is not a party to this action, and Plaintiff has not made any showing of a basis for imposing supervisory liability or *Monell* liability as to this claim.  Accordingly, the Court finds as a matter of law that Mrs. DiGennaro was never seized, and that Defendants are entitled to summary judgment on this claim.

## CONCLUSION

Defendants' application [#77] is granted and this action is dismissed with prejudice. The Clerk of the Court is directed to close this action.

SO ORDERED.

Dated:      June 17, 2013
            Rochester, New York

                                ENTER:


                                /s/ Charles J. Siragusa
                                CHARLES J. SIRAGUSA
                                United States District Judge

---

[32]According to Whitehair, when he entered the home, Mrs. DiGennaro was seated at the dining room table.  He further states that he would have terminated the interview if she had asked him to do so. Whitehair Aff. [#79-3] at ¶ ¶ 7, 16.